# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SHERI HARDCASTLE,

     Plaintiff,

                                 Case No. 17-12491

v.

                                 HON. DENISE PAGE HOOD

CENTER FOR FAMILY HEALTH,

     Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT [Dkt. No. 23]

## I.     INTRODUCTION

Plaintiff filed this action on August 1, 2017, alleging that Defendant discriminated against her on the basis of her disability and race, in violation of the Americans with Disabilities Act ("ADA"), the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), the Civil Rights Act of 1964 ("Title VII"), and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). On April 27, 2018, Defendant filed a Motion for Summary Judgment [Dkt. No. 23], and the Motion has been fully briefed. For the reasons that follow, the Court denies the Motion with respect to the ADA/PWDCRA claims and grants the Motion with respect to the Title VII and ELCRA claims.

## II.    BACKGROUND

Plaintiff was hired by Defendant as the Dental Manager in August 2004. As Dental Manager, Plaintiff's daily duties were scheduling employee shifts; leading the daily "huddle" and staff meetings; giving performance reviews and disciplinary actions; and helping create policies and procedures. She supervised approximately 18 staff, e.g., dental assistants and technicians. Plaintiff reported to Sarah Benedetto ("Benedetto"), a nurse and the Chief Operating Officer for Defendant.  Benedetto reported to Chief Executive Officer Molly Kaser ("Kaser").  Plaintiff was one of five managers reporting to Benedetto.  The job description does not give Plaintiff the authority to – and she did not independently – hire and fire employees, but she participated in staff hiring with the Human Resources Director/Chief Financial Officer Rebecca Snow ("Snow") (who was hired in December 2014), Benedetto, or Drs. Grover and Sarah Malinda.  Plaintiff terminated staff only "upon recommendation of Human Resources," and she "always consulted with either Human Resources or Sarah Benedetto" before disciplining staff and "never wrote anyone up without consulting with" Human Resources or Benedetto.

Benedetto completed Plaintiff's performance reviews.  Those reviews indicated that Plaintiff "effectively manages…operations," is "highly flexible," has a "positive attitude," "problem solves patient issues," does an "excellent job leading staff

meetings," has a "facilitative style that encourages participation," "continues to set the example for employees in department," "demonstrates an understanding of her role as manager," "promote[s] a positive atmosphere," is "considerate of other's opinions," has "excellent leadership skills," "excellent communication skills," "seeks assistance where appropriate," has "excellent conflict resolution skills," exhibits "good leadership" and "skill in handling staff issues," has an "excellent understanding of…operational issues," "brings issues to the appropriate level," "leads with a positive attitude," "works well with others," takes a "proactive approach to problem solving and managing challenging situations," and is a "team player." In January 2015, Benedetto rated Plaintiff as "meet[ing] or exceed[ing] standards of behavior. " On June 26, 2015, Benedetto rated Plaintiff as "Fully Functional," commented that Plaintiff "effectively manages" the dental clinic, and "commended [Plaintiff] on [her] interactions with staff and [her] communication." Plaintiff regularly received merit raises, and Benedetto did not recall ever disciplining Plaintiff.

On three occasions, the last in August, 2007, Benedetto met with Plaintiff in non-disciplinary meetings. Benedetto testified that she "coached" Plaintiff in February 2015 about perceptions of "unfairness" but there is no documentation of that in Plaintiff's personnel file. Benedetto has notes dated in 2014, though Benedetto admits Plaintiff might have come to her for advice at that time—as Plaintiff often did.

In April, 2015, Plaintiff began experiencing vision impairment, facial drooping, migraine headaches, and head and neck pain. Her eye doctor noted abnormalities and sent her to a specialist. Through May and into June, Plaintiff was "off work a lot, which was unusual," for doctor appointments and diagnostic tests. Benedetto was aware that Plaintiff was taking paid time off for medical appointments in this time. In July, 2015, Plaintiff was diagnosed with right-sided Horners Syndrome, a neurological condition that cannot be treated. Horners Syndrome "cause[s] vision difficulty, head pain, and neck pain." Plaintiff's present symptoms include facial droop ("ptosis"), permanent and non-correctable vision impairment, "a pupil that doesn't function" ("miosis", "dilation lag", "pupil asymmetry", "anisocoria") causing cloudy or dark vision, and a "lack of [her] eyes working together," which means that she does not have binocular vision, so she uses only one eye at times. Plaintiff's vision impairment causes blinding headaches which have forced her to take sick time from work, during which she just lays in bed until the headaches go away.

After her diagnosis, Plaintiff researched Horners Syndrome on her office computer "quite often" because she "was pretty scared." She spoke about her diagnosis with Dr. Hardy regarding a possible connection to Lyme disease and staff person Tina Blankenship, who commented on the amount of time off Plaintiff had been taking. Benedetto testified, that, prior to August 12, 2015, Plaintiff "discussed

with [Benedetto] that [Plaintiff] had a medical condition that she had just learned of and that she might have doctors appointments."

On August 12, 2015, Plaintiff and Dr. Malinda met with Benedetto. They discussed clinical issues and a "dentist-driven" request for more staff, which Benedetto approved. According to Benedetto, they also discussed performance concerns later documented in a "Documented Verbal Warning." Benedetto's notes from that meeting reflect that Benedetto flagged medical leave as a possible response to the performance issues. Benedetto testified that it was not her intention to discipline Plaintiff, and the meeting is not documented in Plaintiff's personnel file.

At some point after August 12, 2015 Benedetto decided to discipline Plaintiff—though she did not recall when or why. Benedetto drafted a "Documented Verbal Warning" and discussed Plaintiff's medical condition with Snow, in her capacity as Human Resources Director. Benedetto delivered the "Documented Verbal Warning" to Plaintiff in a meeting on August 20, 2015. Benedetto did not identify anything new that had happened and testified that the concerns from August 12, 2015 were the same ones in the August 20, 2015 discipline. Plaintiff does not "know what happened between that meeting and this verbal warning." It was the first time Benedetto had disciplined Plaintiff in her 11 year career. Benedetto alleged concerns with Plaintiff's "judgment and decision making." Benedetto accused Plaintiff of a

lack of "ownership" by "inferring" to an  employee "that the scoring on [her] performance appraisal was determined by HR and myself [Benedetto]."

During Plaintiff's performance review in July – about a month earlier – Plaintiff had consulted extensively with HR and Benedetto about the review in question and they had approved it prior to delivery.  When Benedetto brought up the review over a month later, Plaintiff said she told the employee she "had consulted with both Sara and Rebecca because it wasn't something she and I had discussed previously." Benedetto testified she had no issue with Plaintiff's actual statement: "[s]he can say that she did" consult Benedetto.  The problem according to Benedetto (who was not in the review meeting) was the "manner in which she does it is not taking ownership." Benedetto directed Plaintiff to change the review because the employee said the concerns had never been raised with her.  Benedetto also alleged that, in the August 12, 2015 meeting, "Sheri inquired about hiring additional dental assistants," however, the request "was not based on the needs of the organization but an individual's desire for more hours."

Contrary to what she wrote, Benedetto testified that she was upset that Plaintiff "had asked HR about hiring or offering more hours to somebody," instead of discussing it with Benedetto.  But Benedetto then admitted that Plaintiff had discussed it with her, *supra*, and that Benedetto decided to add more staff hours because "our

6

data is showing that we can support having eight more hours of hygiene services."

Benedetto then changed her story and alleged that she was upset because Plaintiff inappropriately scheduled Mallory Betz for the hours rather than Doris Schilling. Benedetto admitted that scheduling was up to Plaintiff, and there was no policy directing how she should do it. Plaintiff testified that she offered Betz night hours that "no other hygienist wanted." Neither of these alleged, minor infractions violates Defendant's policies or Plaintiff's job description, as Plaintiff properly sought the advice of HR and her supervisor regarding emergent employee issues.

On August 24, 2015, Plaintiff contacted Snow after three employees brought complaints to Plaintiff about Jazmyn Ragland, an African American dental assistant Plaintiff supervised. The employees complained that Ragland was "screaming at them…, throwing…instruments around, slamming drawers, slamming cupboards, saying…F this" and improperly handling sterilized and unsterilized equipment. These were not the first complaints about Ragland. Ragland had yelled at coworkers, called a dentist "a fucking bitch," and acted so unprofessionally that several dentists refused to work with her. Plaintiff always took those complaints to Benedetto or HR for direction on what discipline, if any, to give. As a result, Ragland's discipline record was lengthy, including two disciplinary meetings with HR and/or her manager, an educational conference, a documented verbal warning, three written warnings, and

a three-day suspension.  Plaintiff also had previously reported to HR an employee complaint that Ragland was "posting derogatory comments about white people on Facebook" ("I'm teaching my children to hate white people."). Dkt. No. 28, Ex. 2 at 46-47, 94).  Ragland was rated "Not Fully Functional" in her only two complete performance reviews.

When Plaintiff reported more employee complaints regarding Ragland, Snow decided to terminate Ragland. "[H]er words were 'This is the last straw. We're going to terminate Jazmyn.'" Plaintiff prepared the dismissal for misconduct, including yelling at co-workers and improperly handing unsterilized instruments which "pose a potentially deadly health hazard for our patients."  Snow and Plaintiff met with Ragland to carry out Snow's decision.  After being told of her termination, Ragland made a number of accusations against Plaintiff.  She accused Plaintiff of being "racist," asserted that Plaintiff "had said something about homosexuals, [and] something…about a car" and "something about welfare people."  This was the first time Ragland had ever complained about Plaintiff.  Snow immediately suspended the decision to terminate Ragland.

Plaintiff received a copy of her August 20, 2015 discipline in interoffice mail, and she was concerned with "how the words were recorded."  She reached out to Benedetto to further discuss her medical diagnosis, and other matters, "that may be

affecting how I'm relating to people." Benedetto testified that they met on August 24, 2015, and Plaintiff reminded Benedetto that she had shared her diagnosis of a neurological syndrome with Benedetto several weeks earlier. Plaintiff told Benedetto her condition "could require a medical leave." Benedetto also told Plaintiff that Ragland had told a member of Defendant's Board of Directors that Plaintiff was racist. Benedetto told Plaintiff to reach out to Snow about the mitigating circumstances, so Plaintiff emailed Snow the following on August 24, 2015:

> I want to let you know that I was diagnosed with a neurological syndrome a few months ago. The cause of the syndrome is most typically caused by brain or spinal cord lesions, thyroid cancer, issues with the carotid artery or lung cancer. I believe this personal issues had taken much of my focus as they run tests to figure out why I have the syndrome.

Dkt. No. 28, Exh 19; Exh 2, pp. 85-86. Snow called Plaintiff and "asked why I was telling her that." Plaintiff told Snow that these were mitigating factors, as Benedetto had requested.

Snow met with Ragland after the termination meeting, and Ragland made additional accusations against Plaintiff, including that she denied an employee bereavement leave, talked to staff disrespectfully, cut staff down and degraded staff. Snow discovered allegations of a few insensitive, but not discriminatory, comments attributed to Plaintiff and an accusation about Doris Schilling not getting more hours. Snow, Benedetto, and Kaser met and agreed to terminate Plaintiff on Snow's

recommendation. On September 2, 2015, Snow and Benedetto terminated Plaintiff. They told Plaintiff only "that some people had said some things, but they weren't going to tell [her what]." Plaintiff was replaced by Erin Tomb, who is white and does not have a disability.

Snow authored a termination memo setting forth the reasons for Plaintiff's termination. Snow testified that Plaintiff was terminated for "poor judgment," because she "ask[ed] somebody if they liked boys or girls,…ask[ed] somebody if they were going to come back to work or whether they were going to go on to welfare," and made statements about an employee's weight. Prior to Snow's investigation, none of these employees had reported any of these alleged comments. Plaintiff denies that she made any of those comments: "I would never say that, and I did not." As to the alleged "favoritism," Snow proffered an unverified accusation that Plaintiff had a "verbal conversation" with "Adrienne" about poking "Stacey," but did not have a "verbal conversation" with Stacey about poking Adrienne. Snow never talked to Stacey and does not know does not know if Plaintiff talked to Stacey or not, or if any of it actually happened. Snow contends that Plaintiff improperly gave extra hours to Mallory Betz instead of Doris Schilling or Katrina Coburn. Snow did not think Plaintiff was being discriminatory, she just thought Betz got hours Schilling should have gotten "[b]ased on the fact that Doris wanted hours and it was within Sheri's

ability to give Doris additional hours." She never talked to Katrina Coburn. None of this was made known to Plaintiff. Plaintiff contacted Defendant's Board and discussed what she knew at that time: that Ragland had accused her of racism and vague statements about sexual preference and welfare. When Defendant did not respond, Plaintiff filed her EEOC charge on November 30, 2015, alleging disability and race discrimination.

Defendant has an employee conduct policy and a progressive discipline policy that apply to all employees. "[D]iscipline goes one year's time" and after that it is "no longer part of the process." Snow testified that the "offenses" for which Plaintiff was terminated were classed as Group 2, which proceed from a written warning, to a one-day suspension, to termination. Plaintiff's termination, which followed her written warning, was not in accord with this policy. Defendant has not terminated employees who engaged in worse conduct than Plaintiff. A dentist was found to have used pornography on Defendant's computers, "a significant issue with a provider" that could create a sexually hostile environment. Benedetto and Kaser gave him a warning "[b]ecause…it was not easy to find dentists." When another employee, David Haueter, quit and complained of disability discrimination by his manager, the CFO,

and Snow,[1] Snow's investigation consisted of talking to the accused and determining that they were "very supportive" of Haueter. When she got Haueter's EEOC charge, her sole response was to talk to Hauteur's manager.

After the August 24, 2015 meeting, Snow rescinded Ragland's termination without any investigation into her conduct. When asked why she did not investigate, her reply was "I just didn't." Ragland received two additional disciplines from Tombs, including a written warning for a HIPAA violation. Snow testified "[j]ust because you have disciplinary action doesn't mean that you are going to be terminated" and Ragland eventually quit on her own.

## III.   APPLICABLE LAW

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is

---

[1]David Haueter had a metabolic disorder that caused him to be obese and suffer from a persistent dermal yeast infection that causes an odor.  Haueter requested that he be given time to adjust medication, diflucan, and allow it to work to address the infection.

"genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV. ANALYSIS

### A. ADA/PWDCRA Claims

The standards for establishing a *prima facie* case for disability discrmination pursuant to the PWDCRA and the ADA are essentially the same and "claims under both statutes are generally analyzed identically." *Cummings v. Dean Transp., Inc.*, 9

F.Supp.3d 795, 804-05 (E.D. Mich. 2014).

> To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: "(1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999). Once a plaintiff establishes a prima facie case of disability discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action against plaintiff. *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520-21 (6th Cir. 1998). Once the employer discharges this burden of production, the employee must demonstrate that the proffered reason was, in fact, a pretext for unlawful disability discrimination. *Id.* at 521. The plaintiff always retains the ultimate burden of persuasion. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 936 (6th Cir. 2000).

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004). "An individual is considered disabled under the ADA if he (1) has a physical or mental impairment that substantially limits one or more major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by his employer as having such an impairment." *Gruener v Ohio Cas. Ins. Co.*, 510 F3d 661, 664 (6th Cir. 2008); *Kiphart v. Saturn Corp.*, 251 F.3d 573, 582 (6th Cir. 2001). *See also* 42 U.S.C. § 12102(2). The "regarded as" prong "cover[s] those who do not presently suffer from a substantially limiting impairment, but are regarded as having such an impairment." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 340 (6th Cir. 2002) (ADA); *Chiles v. Machine Shop, Inc.*, 238 Mich.App. 462, 475 (1999) (PWDCRA).

Defendant asserts that it is entitled to judgment on Plaintiff's ADA and PWDCRA claims because Plaintiff cannot establish that she is disabled. Defendant first argues that Plaintiff has not been substantially limited in any of her life activities. Defendant cites Plaintiff's testimony that Horners Syndrome has not affected her ability to work or drive, nor has it precluded her from engaging in any activities she did prior to her diagnosis. Dkt. No. 23, Ex. E at 91 (Plaintiff confirmed that she could work and drive), 110 (A: " I don't see as well as I did, but, not as well, no. I've adapted to a lot of things." Q: "Okay. So there's . . . nothing that you were engaging in before that you can't engage in now?" A. "No."), 159 ("I'm not letting it stop me from doing anything." and "I'm doing [some things with my vision] differently, but I'm not letting it stop me.").

Plaintiff argues that she is impaired in "several" major life activities, including "seeing." *See* 42 U.S.C. 12102(2)(A) ("major life activities include, but are not limited to, . . . seeing"). The ADA Amendments Act of 2008 ("ADAAA") provides that it is to "be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. 12103(4). Plaintiff argues that, if a person is substantially limited in her ability to perform a major life activity "as compared to most people in the general population," her impairment is a disability. Citing 29 C.F.R. 1630.2(j)(1)(ii) ("An impairment is a disability within the

meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.").

Plaintiff has testified that she has a physical impairment of her eye, anisocoria, miosis and dilation lag caused by Horners Syndrome, such that it impairs her vision, permanently and without a cure, such that she is often only able to use one eye at a time, without binocular vision. Plaintiff also testified that her eye impairment causes her severe headaches that periodically prevent her from working or caring for herself, as she must lie in bed until the headache passes. Citing *Crooks v. Fitness USA Corp.*, No. 04-74289, 2006 U.S. Dist. LEXIS 7585, at **11-14 (E.D. Mich. Feb. 28, 2006) (the major life activity of working affected by migraines). Plaintiff claims that having a neurological disorder, in itself, constitutes a substantial impairment of a major life activity. Citing 42 U.S.C. 12102(2)(B) ("a major life activity also includes the operation of a major bodily function, including . . . neurological"). Plaintiff argues that her symptoms of having her face droop (ptosis) and her pupil to malfunction (anisocoria, miosis, and dilation lag) reflects some impairment and partial paralysis of her neurological system.

Defendant argues that, even if Plaintiff was disabled, there is no evidence that

Defendant was aware of the disability because Plaintiff never requested leave under the Family and Medical Leave Act, she never submitted any restriction notes or requests for accommodation, and she never claimed she was disabled. Defendant notes, and Plaintiff does not dispute, that she told only two of Defendant's employees (Dr. Hardy and Tina Blankenship), neither of whom are managers, about her actual diagnosis and condition. Her supervisor (Benedetto) only knew that she was taking time off for medical appointments, had a new medical diagnoses, and might need medical leave in the future. Defendant contends that this evidence – that Plaintiff could need medical leave – is insufficient to put Defendant on notice that she was disabled.

Defendant asserts that there is no evidence that Defendant believed she was, or treated her as, disabled. Defendant states that Plaintiff merely speculates that Defendant knew that she was Googling "Horners syndrome" frequently at work but there is no evidence that Defendant was monitoring her internet usage at the time. Defendant argues that, although Plaintiff believes that Dr. Hardy or Ms. Blankenship "shared concerns with people" about her condition, Plaintiff has no evidence they did so, particularly with anyone in management.

Plaintiff claims that she first communicated to Benedetto in July 2015 that she had a neurological condition that could require additional medical care, and Benedetto

discussed it with Snow between August 12 and 24, 2015. Dkt. No. 28, Ex. 5 at 119.

On August 24, 2015, after their meeting with Ragland, Plaintiff told Benedetto that

her medical condition could require a medical leave and emailed Snow that the cause

of her condition could be "brain or spinal cord lesions, thyroid cancer, issues with the

carotid artery or lung cancer." Dkt. No. 28, Ex. 19. Plaintiff claims that, because

Benedetto and Snow knew that Plaintiff had a medical condition that might require

taking some leave and could be caused by cancer or brain lesions, there is a genuine

dispute of material fact whether they regarded Plaintiff as disabled.

Even if the Court were to find that Plaintiff has established a *prima facie* case

of disability discrimination, Defendant has offered a legitimate, nondiscriminatory

reason for terminating Plaintiff. Defendant's officers, including Snow and Benedetto,

conducted an investigation into Plaintiff's conduct and then terminated her based on

her conduct as a dental manager (as opposed to Ragland, who was a dental hygienist),

specifically, making numerous inappropriate comments to her subordinate employees

that were investigated and confirmed. In Defendant's words, Plaintiff's termination

was based on Defendant's "standards of behavior and [Plaintiff's] overall poor

judgment as a supervisor," as evidenced by her comments and questions toward her

staff members.

Plaintiff argues that there is a genuine dispute of material fact whether

Defendant's proffered reason for termination was mere pretext for disability discrimination, as there are reasons to believe illegal motivation was more likely than the reason offered by Defendant. Citing *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (a plaintiff may provide evidence of "circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant"). A plaintiff may demonstrate a question of fact regarding pretext if the proffered reason: (1) had no basis in fact; (2) did not actually motivate the defendant's conduct; or (3) was insufficient to warrant the challenged conduct. *Zambetti v. Cuyahoga Comm. Coll.*, 314 F.3d 249, 258 (6th Cir. 2002).

Defendant argues that Plaintiff has submitted to the Court no pretextual evidence or circumstances that Plaintiff's alleged disability factored into Defendant's decision to terminate Plaintiff or that Plaintiff's alleged disability was factored into any aspect of her employment by Defendant.

Plaintiff counters that Defendant's claim that Plaintiff was terminated for "poor judgment" is not credible, as: (1) Plaintiff denies she made any of the comments attributed to her; (2) the alleged complaints were stray remarks and uncorroborated; (3) the investigation regarding Plaintiff's alleged conduct was incomplete, as no one spoke to Plaintiff and some other relevant employees, even though Snow testified that such an investigation required speaking to both the accused and relevant witnesses;

and (4) under Defendant's progressive discipline policy, Plaintiff should have, at most, been suspended, not terminated. The first two arguments are not persuasive, as they do not support Plaintiff's claims even if they are true.

The fourth argument is based on Defendant's progressive discipline policy. Plaintiff's termination, which followed her written warning, was not in accord with the "offenses" for which Plaintiff was terminated (classed as Group 2), which proceed from a written warning, to a one-day suspension, to termination. But, there is no requirement that Defendant suspend an employee before discharge, no matter what the alleged misconduct is. The third argument, taken in a light most favorable to Plaintiff, does suggest that Defendant's decision was reached without adhering to Defendant's own investigation policies.

More significantly, Plaintiff's reviews, even the one less than two months before she was terminated, showed her to be highly rated, described as an effective manager, and commended on staff interactions and communication. As noted above, on June 26, 2015, Benedetto's review of Plaintiff "commended [Plaintiff] on [her] interactions with staff and [her] communication." Plaintiff states, and Defendant has not disputed, that she "had 11 years of good conduct, excellent reviews" during her employment with Defendant. Dkt. No. 28, Ex. 2 at 112-13. Plaintiff argues that being terminated for poor judgment so soon after those reviews shows that there is a genuine

dispute whether Defendant's reason for terminating her was reasonable or pretextual. Citing *Sala v. Hawk*, 481 F. App'x 729, 733-34 (3d Cir. 2012) ("Sala's positive annual employment evaluations raise serious questions of material fact as to whether the reasons articulated by Hawk in his memorandum merely served as pretext for unlawful discrimination."); *Guyton v. Exact Software N. Am.*, 2016 U.S. Dist. LEXIS 95265, at **44-48 (S.D. Ohio July 21, 2016) ("a jury could infer that the decision to terminate Guyton, who had 25 years of experience with the company and favorable performance reviews" based on one complaint "was not a reasonable one" as it reflected "the company's departure from its standard disciplinary procedure"). *See also Smith v. City of Salem, Ohio*, 378 F.3d 566, 570-71 (6th Cir. 2004) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation").

Plaintiff argues that Defendant terminating her but not a doctor who used office computers for pornography shows that her punishment was excessive for the underlying conduct, which supports a finding that her medical condition (disability) was the true reason for her termination. Plaintiff also argues that Defendant's employees (Snow and Kaser) previously demonstrated hostility toward David Haueter, another employee with a disability. Snow, Kaser, CFO Dale Ernst, and his

manager Michelle Mayo harassed Haueter and subjected him to "smell checks." Snow refused to accept his doctor's letters, told him he didn't have a disability, and insisted any odor was caused by obesity and poor hygiene. Kaser threatened to discipline him by sending him home if she smelled anything. Snow, Kaser, and Benedetto deny that Haueter had a disability, that his problems were caused by a medical issue, and/or that he has a medical issue at all. Nobody was ever disciplined for their conduct toward Haueter, who eventually resigned.

Although Defendant disagrees with the materiality of its failure to terminate a doctor for using office computers for pornography (because "dentists are hard to come by") and its conduct toward former employee David Haueter, the Court finds that this evidence is probative on the issue of whether Plaintiff was fired for cause or due to disclosing that she had Horners Syndrome.

Defendant's Motion for Summary Judgment is denied with respect to Plaintiff's disability discrimination claim because there is a genuine dispute of material fact with respect to whether she was disabled and whether Defendant's proffered reason for terminating Plaintiff was mere pretext for unlawful discrimination.

**B.     Race Discrimination - Title VII and ELCRA**

Claims of discrimination brought pursuant to ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII. *Jackson v.*

*Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Plaintiffs' Title VII and ELCRA

discrimination claims will be analyzed together. Under both Title VII and ELCRA,

a "plaintiff bringing a[n] . . . employment discrimination claim must present either

direct evidence of discrimination, or circumstantial evidence that allows for an

inference of discriminatory treatment." *Reeder v. City of Wayne*, 177 F.Supp.3d 1059,

1079 (E.D. Mich. 2016) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir.

2003)). Plaintiff concedes that this is not a direct evidence case.

> When a plaintiff seeks to prove racial discrimination by circumstantial
> evidence, the court applies the *McDonnell Douglas* framework. First, a
> plaintiff must establish a prima facie case of discrimination by showing
> that: (1) she is a member of a protected class; (2) that she was qualified
> for the job and performed her duties satisfactorily; (3) that despite her
> qualifications and performance, she suffered an adverse employment
> action; and (4) that she was replaced by a person outside of the protected
> class or was treated less favorably than a similarly situated individual
> outside of the protected class. If a plaintiff establishes a prima facie case
> of discrimination, the burden then shifts to the defendant to "articulate
> some legitimate, nondiscriminatory reason for the employee's rejection.

*Hawthorne-Burdine v. Oakland Univ.*, 158 F. Supp. 3d 586, 604 (E.D. Mich. 2016)

(internal citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973)). "Throughout this burden shifting, '[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods.,

Inc.*, 530 U.S. 133, 143 (2000). "The plaintiff cannot rely purely on 'mere personal

belief, conjecture and speculation' as they are insufficient to support an inference of discrimination." *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).

As a Caucasian individual at a workplace where the majority of employees are Caucasian, Plaintiff raised a claim of reverse discrimination because she was terminated by Snow, whereas Ragland (an African-American) was not terminated. Plaintiff's claim fails because she cannot satisfy the fourth element of a *prima facie* case. First, there is no evidence Plaintiff was replaced by someone outside of her "protected" class. The only evidence regarding Plaintiff's replacement is that her position was filled by a Caucasian woman.

Second, there is no evidence Plaintiff was treated less favorably than a similarly situated individual outside of the protected class. Plaintiff argues that there were only four persons that held positions similar to hers, so the "pool of comparators . . . amount[s] to no more than a few individuals, . . . render[ing] . . . plaintiff's burden virtually impossible," such that strict comparability is not required. Citing *Louzen v. Ford Motor Co.*, 718 F.3d 55 (6th Cir. 2013). Even accepting Plaintiff's contention as true, it is undisputed that Plaintiff was a manager (in fact, Ragland's manager) and held a management position, something that Ragland did not hold.

Plaintiff's contention that she and Ragland were subject to the same discipline policy by the same supervisor (Snow) is not sufficient to render them comparable,

particularly when Plaintiff and Ragland were not accused of the same conduct. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis added) ("the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and <u>have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it</u>").

Even if the Court were to find that Plaintiff has established a *prima facie* case of race discrimination, Defendant has offered a legitimate, nondiscriminatory reason for terminating Plaintiff. Defendant's officers, including Snow and Benedetto, conducted an investigation into Plaintiff's conduct and then terminated her based on her conduct as a dental manager (as opposed to Ragland, who was a dental hygienist), specifically, making numerous inappropriate comments to her subordinate employees that were investigated and confirmed. In Defendant's words, Plaintiff's termination was based on Defendant's "standards of behavior and [Plaintiff's] overall poor judgment as a supervisor," as evidenced by her comments and questions toward her staff members. And, unlike her claim under the ADA, Plaintiff has submitted to the Court no pretextual evidence or circumstances – such as race-based comments or actions regarding Plaintiff or anyone else – that Plaintiff's race factored into Defendant's decision to terminate Plaintiff or that Plaintiff's race was factored into

any aspect of her employment by Defendant for more than 11 years.

The Court grants Defendant's Motion for Summary Judgment on – and dismisses – Plaintiff's Title VII and ELCRA claims for race discrimination.

## V.    CONCLUSION

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment [Dkt. No. 23] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Plaintiff's Title VII and ELCRA claims for race discrimination are DISMISSED and Plaintiff's ADA/PWDCRA claims remain before the Court.

IT IS ORDERED.

s/Denise Page Hood
Chief Judge, U. S. District Court

Dated: March 28, 2019